UNITED STATES of America,

v.

**Pedro RIVERA, et al., Defendants.**

Criminal No. 95–84(HL).

United States District Court,
D. Puerto Rico.

Jan. 17, 1996.

Jorge E. Vega, Chief, Criminal Division, U.S. Attorney's Office, San Juan PR, Charles De Monaco, Assistant Chief, Michael Woods, Trial Attorney, U.S. Department of Justice, Environmental Crimes Division, Washington, D.C., for plaintiff.

Joseph Laws, San Juan PR, for Pedro Rivera.

Ramón García García, San Juan PR, for Bunker Group of P.R.

Yolanda Collazo, Bayamón PR, for Bunker Group Inc.

Jorge L. Arroyo, San Juan PR, for New England Marine Services.

## ORDER

LAFFITTE, District Judge.

Before the Court is the Report and Recommendation of Magistrate Judge Delgado–Colón regarding the appointment of counsel for the defendants in this action. The Court has carefully reviewed the record and the Report and Recommendation, as well as the objections thereto. The Court hereby adopts the Report and Recommendation and orders as follows:

The Court hereby vacates the appointment under the Criminal Justice Act of counsel for the corporate defendants. The corporate defendants are hereby granted until **January 25, 1996** to retain new counsel and have that counsel make an appearance. If new counsel has not been retained by that date, the Court will designate attorney Jorge Arroyo–Alejandro to represent Defendant New England Marine Services, Inc., attorney Yolanda Collazo Rodriguez to represent Defendant Bunker Group Incorporated, and attorney Ramon Garcia to represent Defendant Bunker Group Puerto Rico. These alternative designations will *not* be made under the Criminal Justice Act.

In the event the above-named attorneys are appointed to represent the defendants, their fees and expenses will be paid from the assets and properties listed in the Court's order of April 6, 1995.

The Court further orders that Peter Frank be appointed as corporate representative for the corporate defendants. In this capacity Peter Frank will be personally responsible to ensure that the defendant corporations comply with any Court orders, including orders regarding payment of attorneys. Failure to comply with these responsibilities will result in his being subject to criminal contempt penalties.

The status conference scheduled for January 19, 1996, is hereby reset to **January 31, 1996,** at 2:00 p.m. Among the matters to be considered at the status conference will be Jared Stamell's motion to vacate the Court's order of April 6, 1995.

**IT IS SO ORDERED.**

## *REPORT AND RECOMMENDATION*

DELGADO–COLON, United States Magistrate Judge.

### I. BACKGROUND OF THE CASE

On April 5, 1995, a Grand Jury returned an indictment against Pedro Rivera (Rivera), Bunker Group of Puerto Rico (BGPR), Bunker Group, Inc. (BG), and New England Marine Services (NEMS). The defendants were charged with violating the Federal Water Pollution Act, also known as the Clean Water Act, 33 U.S.C. § 1251 *et seq.;* specifically, Counts II and III depict a violation of 33 U.S.C. § 1321(b)(3), 1319(c)(1) and 1232(b)(1), respectively. Count I depicts a violation to 46 U.S.C. § 10908. **(Docket No. 1)**

At government's request, on April 6, 1995, the Court issued an order determining that the corporate defendants were constituent parts of an integrated group of more than fifty corporate entities controlled by Peter Frank, Jane Frank Kresch and Susan Frank Stamell, both sisters of Peter Frank. The Order listed the properties that appeared to be under the control or custody of the integrated enterprise and, under 28 U.S.C. 1651, prohibited said properties from being removed from its location, concealed, destroyed or disposed of without prior Court authorization. **(Docket No. 5)** The Order also provided the corporate defendants an opportunity to state their position in regards to this Order. This opportunity was twice declined by the defendants by their failure to appear at Court scheduled hearings. (*See* **Docket Nos. 15, 17, 23, 25, 30, and 32.**) As of May 24, 1995, the corporate defendants had not been arraigned. Although the government argued that the defendants had sufficient funds to secure legal representation, on that date Peter Frank represented to the Court that the three corporate defendants had no assets and were unable to retain counsel. Inasmuch as Peter Frank was identified as

the President for all three corporations, he was then appointed the corporations' representative. On that same date the Court appointed Attorney Joseph Laws, also the attorney for defendant Rivera, for arraignment purposes only. **(Docket Nos. 33–35)**

On May 25, 1995, the government filed a motion requesting that each corporate defendant be appointed separate counsel provided that all corporate defendants be ordered to *reimburse* all legal fees and expenses incurred in relation to their defense. The government contended that the Court maintained the authority to appoint counsel to a recalcitrant defendant, but that legal fees and expenses could not be paid from public funds. 18 U.S.C. § 3006A. **(Docket No. 36)** On June 2, 1995, the Federal Public Defender [1] (for BGPR) and Attorneys Yolanda Collazo (on behalf of BG) and Jorge Arroyo (for NEMS) were appointed as counsel for the corporate defendants. **(Docket No. 39)** Although not clearly stated, it is understood that said appointments were made under the provisions of the Criminal Justice Act, 18 U.S.C. § 3006A *et seq.*

The government sought a "Reimbursement Order" through its July 26, 1995 motion. The government reinstated their contention (accepted by the Court on April 6, 1995) to the effect that (a) the corporate defendants were constituents of an integrated group of family operated corporate entities; (b) had the necessary funds to secure legal representation; and (c) under this or any other scenario, the legal fees and expenses could not be paid from public funds.[2]

In order to determine whether the corporate defendants were entitled to legal representation under 18 U.S.C. § 3006A and whether they had the necessary funds to secure legal representation, an evidentiary hearing was held on August 15, 1995.

1. On June 30, 1995, Attorney Ramón García was appointed to represent BGPR and substitute for the Federal Public Defender who had withdrawn due to a conflict of interests. **(Docket No. 47)**

2. The government proffered that "the degree of integration among the corporate entities in the group, and the degree of control vested by Peter

## II. EVIDENCE PRESENTED

At the hearing the government presented the expert testimony of John O'Connor (hereinafter O'Connor), a certified public accountant and certified fraud examiner with expertise in forensic accounting. At the inception of this investigation, the government decided to retain expert services to assess "how the group of the Frank family companies was structured" and then have the companies' assets identified. O'Connor, even having been subjected to vigorous and detailed cross-examination, emphatically stated that having examined the companies' voluminous records, financial statements and income tax returns for either the corporations and/or its officers, he had concluded that the Frank family companies were actually a single integrated enterprise comprised of over fifty (50) corporate entities; that all operations were centrally controlled by the Frank brother and sisters and their close friends; and that the companies' assets moved freely within the companies through inter-company transactions. Due to the government's overwhelming evidence, that was not rebutted by the defendants, we feel compelled to agree with such determinations. As stated by O'Connor, the transfer of assets throughout the companies was not consistently accounted for in accounting books. Occasionally such transactions were conducted to enable the use of such funds by Peter Frank or his sisters for their personal benefit. The data examined by O'Connor also revealed a pattern of moving assets in order to avoid civil, criminal or tax liability.

Although O'Connor during cross-examination admitted that he never conducted or received independent appraisals of the assets held by every corporation and did not know whether there were pending liens over all of the enumerated assets, he concentrated his efforts in identifying the existence of assets that do have, at the present time, considerable equity.

Frank over all the entities, create a situation in which assets can be moved through the integrated enterprise as needed." **(Docket No. 56)** In its motion, the government provided specific examples depicting such conduct and alluded to other actions to shield corporate assets from civil, tax and criminal liability.

Daniel Jacobson (Jacobson),[3] an attorney and certified public accountant who had previously rendered professional services to more than one of the Frank-owned companies, was also called to testify on behalf of the corporate defendants.[4]

Although Jacobson's testimony was proffered as essential, we are under the impression that even defense counsel was taken by surprise given the witness' inability to articulate the reasons why he considered the corporate defendants financially unable to retain counsel. Furthermore, the last time Jacobson had any contact or conducted auditing for one of the Frank's companies was around 1989–1990, and he did not have specific knowledge concerning the equity of any given asset.

During an incisive cross-examination, Jacobson even admitted that upon having examined O'Connor's reports, he also considered there were numerous transactions among companies that do have the same common control, with the same persons being the shareholders and officers for such companies. Furthermore, upon being asked to examine financial and auditing statements that his firm had prepared either for NEMS or other affiliates **(Exhibits C and 7)**, he conceded that there were notes that reflected: (a) long-term loans to corporate affiliates, controlled by the Franks in the sum of $1,116,400 for which there was no data supporting its collectability; and (b) that a 1990 audit for Standard Marine Services also reflected that $397,497 had been loaned to Peter Frank. Neither loan bore interests and still then appeared as collectable. When directly questioned, he considered "fair" the government's assertion that all documents he had presented alluded "to related companies with commonly related party transactions that do operate with a common centralized control." Jacobson estimated that at a given point, all the deposits of approximately 25 of said companies did go to a single bank account. Among these companies was NEMS.

Similarly situated was BG. **(Exhibits 8 and 9)**

## III. APPOINTMENT OF COUNSEL UNDER THE CRIMINAL JUSTICE ACT

Under 18 U.S.C. § 3006A(a) it is specifically provided that

(1) Representation shall be provided for any financially eligible person who—

(A) is charged with a felony or a Class A misdemeanor;

(B) is a juvenile alleged to have committed act of juvenile delinquency as defined in section 5031 of this title;

(C) is charged with a violation of probation;

(D) is under arrest, when such representation is required by law;

(E) is charged with a violation of supervised release or faces modification, reduction, or enlargement of a condition, or extension or revocation of a term of supervised release;

(F) is subject to a mental condition hearing under chapter 313 of this title;

(G) is in custody as a material witness;

(H) is entitled to appointment of counsel under the sixth amendment to the Constitution;

(I) faces loss of liberty in a case, and Federal law requires the appointment of counsel; or

(J) is entitled to the appointment of counsel under section 4109 of this title.

Under § 3006A(i) it is also specified that the U.S. Courts may appropriate "out of any money in the [U.S.] Treasury not otherwise appropriated, sums necessary to carry out the provisions of this section." As it can be clearly determined, § 3006A provides for the appointment of counsel and payment of legal representation on behalf of "persons" not deemed to be corporate defendants.

---

**3.** Jacobson also admitted having acted as a trustee for Peter Frank's mother who used to have 50% of the shares in Angus Tank Cleaning.

**4.** On August 15, 1995, at NEMS's request, who argued to be defenseless if not allowed to retain expert services and with the acquiescence of the government, authorization was given to NEMS to retain expert services subject to an order of reimbursement if a determination adverse to the defendants concerning their financial condition was rendered. **(Docket No. 61)**

Furthermore, it has been clearly stated in the Guide to Judiciary Policies and Procedures for the Appointment of Counsel in Criminal Cases, Vol. VII, Chapter II, Section A, Subsection E(2) (March 1, 1991), that:

> Cases or proceedings which are *not* covered by or compensable under the Act include the following:
>
> (1) ...
>
> (2) Corporate defendant cases
>
> (3) ...
>
> (4) ...
>
> (5) ...

In accordance with such guidelines, the Model Criminal Justice Act Plan for the District of Puerto Rico, 1981 as amended, does *not* provide for the legal representation of corporate defendants.[5]

Following what appears to be a clear rule towards an issue which seldom arises, the Court of Appeals for the Ninth Circuit in *U.S. v. Unimex, Inc.*, 991 F.2d 546, 550 (1993), has stated that "neither the Sixth Amendment nor the Criminal Justice Act section providing for appointment of counsel for indigent 'persons' provide corporations with a right to appointed counsel, **even if they cannot afford to retain their own.**" (Emphasis added.)

In *Unimex, supra,* the corporation was charged and convicted of conspiring to launder drug money and filing currency transaction reports. The government having forfeited all its assets, the corporation was rendered financially unable to retain legal services. Although Unimex sought the return of $100,000, untainted by the crime, from the $2 million that were seized, the Court denied its request and forced Unimex to go to trial without legal representation. Under this scenario, it was determined that due to the government's actions, the corporate defendant had been denied its right to counsel. However, as correctly argued by the government, the scenario in the instant case is quite different. There has been no assets of the corporate defendants forfeited and each corporation has continued to exercise management and control over its assets.

As stated in *Unimex,* 991 F.2d at 550, if the purpose of § 3006A is to "assure that criminal defendants' constitutional right to appointed counsel is protected, then no appointments are needed for corporations. Being incorporeal, corporations cannot be imprisoned, so they have no constitutional or § 3006A right to appointed counsel." *Id.* (citing, *Scott v. Illinois,* 440 U.S. 367, 99 S.Ct. 1158, 59 L.Ed.2d 383 (1979)). *U.S. Hoskins,* 639 F.Supp. 512 (W.D.N.Y.1986), *aff'd* without pub.'d op., 875 F.2d 308 (2nd Cir.1989).

█ In view of the above-stated rules and legal precedents, we are moved to follow the Ninth Circuit Court of Appeals and find that neither under Puerto Rico Local Rule 402, the Model Criminal Justice Act Plan for this District, § 3006A, or the Sixth Amendment of the United States Constitution are corporate defendants, even if financially unable, entitled to the appointment of counsel under CJA or to have legal fees and expenses paid from public funds. Thus, it is **RECOMMENDED** that the appointment of counsel under the Criminal Justice Act be **VACATED.**[6]

## IV. COURT'S INHERENT AUTHORITY TO APPOINT COUNSEL AND COMPEL PAYMENT OF ATTORNEY'S FEES

Rule 43 of the Federal Rules of Criminal Procedure outlines the stages of a criminal case at which defendant's presence is or is not required. Specifically, Rule 43(c) reads:

> (c) **Presence Not Required.** A defendant need not be present in the following situations:
>
> (1) A corporation may appear by counsel for all purposes.
>
> (2) ...
>
> (3) ...
>
> (4) ...

Courts have unequivocally held that a corporation may be represented only by a li-

---

5. Under Local Rule 402.1, Right to Assigned Counsel, a similar rule was adopted.

6. Consequently, no appropriation or disbursement of funds may be ordered under § 3006A.

censed attorney. *In re Victor Publishers, Inc.*, 545 F.2d 285 (1st Cir.1976); *U.S. v. 9.19 Acres of Land*, 416 F.2d 1244, 1245 (6th Cir.1969); *Shapiro, Bernstein & Co. v. Continental Record*, 386 F.2d 426 (2nd Cir.1967); *Schreibman v. Walter Heller & Co.*, 446 F.Supp. 141, 143 (D.P.R.1978); *Simbraw, Inc. v. U.S.*, 367 F.2d 373 (3rd Cir.1966); *Flora Construction Co. v. Fireman's Fund Insurance Co.*, 307 F.2d 413, 414 (10th Cir. 1962), *cert. denied*, 371 U.S. 950, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963).

This rule is based on two principles: first, common law, and second, on the practical consideration that "since a corporation can appear only through its agents, they must be acceptable to the court; attorneys at law, who have been admitted to practice, are officers of the court and subject to its control." *In re Victor Publishers*, 545 F.2d at 286.

■■■ Another general principle which must be considered in ˙this case is that a criminal defendant is ordinarily entitled to representation by counsel of choice. Unless the defendant exercises that privilege within a reasonable period of time, moreover if financially able to retain counsel, said right to counsel of his choice is waived. *U.S. v. Rodríguez*, 496 F.2d 960, 964 (1st Cir.1974); *U.S. v. Terry*, 449 F.2d 727, 728 (5th Cir.1971). Inasmuch as a defendant's right to retain counsel of his choice may not interfere with the efficient administration of justice, when confronted with a recalcitrant defendant who refuses to retain counsel, to suggest alternatives, or submit to the jurisdiction of the Court, the Court in its discretion may appoint counsel. *See, Link v. Wabash Railroad Co.*, 370 U.S. 626, 630, 82 S.Ct. 1386, 1388–89, 8 L.Ed.2d 734 (1962); *Terry v. Enomoto*, 723 F.2d 697, 699 (9th Cir.1984), *cert. denied*, 469 U.S. 845, 105 S.Ct. 155, 83 L.Ed.2d 93 (1984). Courts, undoubtedly, are vested with an "inherent power" to control and "manage their own affairs so as to achieve the orderly and expeditious disposition of cases." 370 U.S. at 630–631, 82 S.Ct. at 1388–89.

■■■ In the instant case there is no doubt that the Court provided the corporate defendants with ample opportunity to retain counsel. In spite of the opportunities given by the Court, the corporate defendants failed to appear at two initial hearings, to designate a corporate representative and retain counsel. Even when Peter Frank did appear in court, although not a defendant in a case, he insisted in claiming protection under the Fifth Amendment, protection to which corporations are not entitled. Furthermore, he refused to provide the Court with the information that had been requested from the corporations. It was not until Peter Frank's appearance on May 24, 1995, that the Court designated him as the corporate defendant's representative and appointed counsel.

Strictly applying the two principles previously enunciated, it appears that the Court is left with no other alternative than to appoint counsel on behalf of the three corporate defendants, namely BG, BGPR, and NEMS.

However, in *U.S. v. Crosby*, 24 F.R.D. 15 (S.D.N.Y.1959), the bankruptcy court appointed the corporation's sole shareholder to assume its legal representation in all bankruptcy related matters. While doing so, the Court stated that "it would be idle to provide for summoning a corporation if the court, after so doing, could not render judgment against it." The Court must, therefore, have the power to appoint one of its attorneys and officers to appear for the corporation.[7] When deciding whether a corporate defendant may be represented by one of its officers or one of its attorneys, courts have assessed, among other elements, whether:

(a) conflicting interests between the officers and the corporation exists (*Schreibman, supra*);

---

7. Although *Crosby* was decided in the context of bankruptcy proceedings, given the precautions taken by the court in assessing the corporate defendants' interests and those of its officers prior to departing from the general rule, it is considered that substantial rights of the corporate defendants will not be jeopardized by extending similar principles to similar factual scenarios. After all, it is an accepted principle that even a "person" may choose to represent him/herself and the court will still be bound to provide procedural safeguards to the person that so elects.

(b) a non-lawyer may assume legal representation of the corporate defendant (*In re Victor Publishers, supra*);

(c) the corporate representative to be designated is the principal, shareholder or has the authorization of corporate officials (*In the Matter of Holliday's Tax Services, Inc.,* 417 F.Supp. 182 (E.D.N.Y.1976); and

(d) the corporate representative is an attorney (*U.S. v. Crosby, supra*).

In the instant case Peter Frank, already designated as the corporate defendants' representative, is an attorney at law. **(Page 3, Transcript of hearing held on April 6, 1995).** His knowledge of the corporate defendants' structure and internal proceedings is unquestionable, inasmuch as he is the President of all three corporations and owns one-third of the shares of BG and NEMS. Due his educational background, of course, if appointed to represent his corporations, he will be in a better position than many other non-lawyers who elect to proceed *pro se.*

Based on its inherent power to appoint counsel, to supervise the proper administration of justice, and have its orders enforced, courts have allowed and created exceptions regarding a corporate defendant's right to be represented by counsel. For example, in *Schreibman v. Walter E. Heller & Co.,* 446 F.Supp. 141, 143 (1978), reference is made to *In re Las Colinas,* 453 F.2d 911 (1971), in which purportedly the president of the corporation was permitted to assure its legal representation.[8] If an individual has a statutory right to represent himself in federal court, even if he is not a lawyer (28 U.S.C. § 1654), no reason (other than common law and practical consideration) have been advanced by any court as to why recalcitrant corporate

defendants, with the financial capabilities to retain counsel, whose president is not only one of three shareholders of a family operated enterprise could not be appointed as counsel for the corporations. The corporate defendants have not advanced the existence of conflicting interests between them and its officers. Besides that, nothing appears to impede the designation of Susan and/or Jane Frank[9] as corporate representatives and the appointment of Peter Frank as its legal representative. This appears as an alternative to be considered in the instant case.

## V. DEFENDANTS' FINANCIAL CAPABILITIES AND/OR ABILITY TO RETAIN COUNSEL [10]

■ Considering the flexibility with which monies, assets and liabilities are transferred among the corporate defendants and other non-defendant corporations also owned by Peter Frank or the Frank family; the equity of assets privately owned by the corporate defendants' officers; how corporate funds are transferred and used for the personal benefit of its corporate officers; and how some of those assets could be liquidated and/or is in the process of being sold, generating a capital gain to either Peter Frank or one of his sisters, we are compelled to conclude that the three corporate defendants are financially able to secure counsel.

Based on the evidence presented, it is concluded:

### A. Representative Share of Ownership in the Corporate Defendants—

### 1. Bunker Group Incorporated

Bunker Group Incorporated is owned in equal shares by Peter Frank, Jane

---

**8.** It must be clarified that although so stated in *Schreibman, supra,* and at *In re Victor Publishers,* 545 F.2d at 286, no such reference was explicitly found in *In re Las Colinas, supra.*

**9.** Jane and Susan Frank each own one-third of the shares of BG and NEMS and are occupying the Secretary and Treasurer's positions.

**10.** Upon conclusion of the hearing, the government was requested to summarize the assets

identified throughout O'Connor's testimony and to try to ascertain the market value and equity of the assets listed as property of each of the corporate defendants. Said information was provided on August 22, 1995, and inasmuch as it completely conforms to O'Connor's testimony and was disclosed to the defendants, it is now adopted in support of our conclusion that the corporate defendants have the economic resources to secure legal representation.

Frank and Robert Powell,[11] BGI owns all the stock in:

Bunker Group New York, Inc.

Bunker Group Puerto Rico, Inc. (a corporate defendant)

Bunker Group Boston, Inc.

Bunker Group Virginia, Inc.

Bunker Group Delaware, Inc.

Bunker Group Carolina, Inc.

(*See* **Exhibit 3**)

### 2. Bunker Group of Puerto Rico

Bunker Group Incorporated owns all the stock in Bunker Group of Puerto Rico. Peter Frank is the president of Bunker Group Puerto Rico and Jane Frank Kresch is the secretary.

### 3. New England Marine Services

New England Marine Services is owned in equal shares by Peter, Jane and Susan Frank. Peter Frank is the president, Susan Frank Stamell is the treasurer, and Jane Frank Kresch is the secretary.

### B. Non–Defendant Corporations Owned by the Franks—

### 1. Standard Marine Services (SMS)

Its shares are equally owned by Peter, Jane and Susan Frank. Susan Frank, as of 1990, was its president, Peter Frank was the vice-president, and Jane Frank the secretary/treasurer.

a. SMS owns all the stock in:

Bayonne Properties

Standard Tank Cleaning Co., Inc.

Standard Tank Terminal Corp.

Standard Tank Cleaning Corp.

Berman Enterprises, Inc.

Marine Movements, Inc.

Barge Operations, Inc.

Waterways Towing, Inc. ·

General Marine Transport Corp.

Sludge Tank Cleaning Co., Inc.

Standard Marine Transport Services

Water Facilities, Inc.

Mercury Tank Cleaning Corp.

(*See* **Exhibit 3**)

### 2. Standard Marine Cleaning Services, Inc.

Standard Marine Cleaning Services is owned in equal shares by Peter and Jane Frank. Susan Frank Stamell is its president, Peter Frank is vice-president, and Jane Frank is secretary/treasurer.

### 3. First Marine Shipyard, Inc.

First Marine Shipyard, Inc. is owned by Peter Frank (25%) and Jane Frank Kresch (75%). Peter Frank is the president and Jane Frank Kresch is the secretary/treasurer.

### 4. Island Consulting Group (ICG) [12]

ICG is owned in equal shares by Peter Frank, Susan Stamell Frank and Jane Frank Kresch.

### 5. Virginia Tank Logistics

Virginia Tank Logistics is owned by Peter Frank (17%), Susan Frank Stamell (17%), Jane Frank Kresch (17%), Robert Powell (16%), John Powell (17%), and Noble Darrow (16%). The involvement of both John and Robert Powell appears to have ended in late 1992, but the documents are ambiguous on this point.

### 6. Cheshire Place Associates

Cheshire Place Associates is a partnership consisting of Parklane Marine Transport Corporation as general partner, and Peter Frank, Jane Frank Kresch, and Bayonne Properties, Inc., as limited partners.

### 7. Park Lane Associates

Park Lane Associates is a limited partnership consisting of Parklane Marine Transport Corporation as general partner (and 1% owner), and Peter Frank (24.75% owner), Susan Frank Stamell

---

11. In 1992, Robert Powell surrendered his ownership interest. It is unclear whether his interests were divided equally between the Franks.

12. According to the Frank's own accountants, ICG was simply a paper company which incurred no expenses and had no revenue of its own. It was designed by Peter, Jane and Susan Frank to be an intermediary for approximately $2.5 million to be received from International Marine Carriers (IMC). **(Exhibit 6)**

(41.25% owner), Jane Frank Kresch (33% owner) as limited partners.

8. **F.K.S. Holdings**

F.K.S. Holdings is owned in equal shares by Peter Susan Jane Frank.

### C. Vessels owned by various Frank companies.[13]

According to information provided by Mr. Frank on May 24, 1995, the following vessels are owned by Frank companies:

1. Bunker 1000, barge appraised at $200,-000, **owned by Bunker Group, Inc.** (*See* **Exhibit 6**)
2. VTL–1, barge appraised at $500,000, owned by Bunker Group Virginia.
3. Bunker Delaware, barge appraised at $450,000, owned by Bunker Group Virginia.
4. Bunker Chesapeake, barge appraised at $450,000 owned by Bunker Group Virginia.
5. Bunker Norfolk, barge appraised at $300,000, owned by Bunker Group Virginia.
6. Susan Frank, a self-propelled tanker appraised at $300,000, owned by General Marine Transport Corp. (a subsidiary of Standard Marine Services).
7. Nathan Berman, barge appraised at $250,000, owned by Marine Movements (a subsidiary of Standard Marine Services).
8. New York 30, appraised at $875,000, **owned by New England Marine Services.** (*See* **Exhibit 6**)
9. New England 29, appraised at $950,-000, **owned by New England Marine Services.** (*See* **Exhibit 6**)

### D. List of Assets Having Significant Current Value (Exhibit 5)

1. Real estate consisting of an oil storage and tank cleaning facility in Bayonne, New Jersey. The 1993 tax assessments place the value of this property at $4.5 million. The property is owned by Bayonne Properties, Inc. According to Mr.

Frank, the property is vacant and attempts are being made to sell or lease it. At this time, the government has no information regarding liens or other encumbrances on this property.

2. Real estate consisting of an eighteen-acre shipyard in Staten Island, New York. This property is an eighteen-acre shipyard owned by and operated as First Marine Shipyard. It was appraised at a value of $7.75 million in 1990 and assessed for tax purposes in 1993 with a value of $3.7 million. First Marine Shipyard is currently in Chapter 11 bankruptcy and, according to Mr. Frank, negotiations are ongoing to find a buyer for the property under First Marine's Chapter 11 reorganization.

3. The residence of Peter Frank located at 20 East 20th Street, New York, New York. This residence was valued at approximately $600,000. According to a financial statement signed by Mr. Frank on January 7, 1994, the present balance of the mortgage on the property was $500,000. Its equity, thus, is $100,000.

4. The residence of Jane Frank Kresch located at 860 Park Avenue, New York, New York. This residence has been valued at approximately $3.2 million and is subject to a mortgage of no more than $300,000. It has an equity of approximately $2.9 million.

5. The residence of Susan Frank Stamell located at 118 East 78th Street, New York, New York. The residence itself is valued at more than $1 million and insurance documents in the government's possession indicate that is contains more than $560,000 worth of art, antiques, and other items. In a 1987 financial statement, Susan Frank Stamell reported a mortgage with a present balance of $905,000 which appears to apply to this property. In a draft financial statement prepared in May 1994, Jared Stamell represented that the residence had a value of $1.8 million and was subject to approximately $800,000 worth of debt. Its equity is being estimated in $1 million.

---

13. The government was not able to provide the actual market value of these vessels or information on loans or existing encumbrances, but inasmuch as all vessels are still operating, it is assumed additional income continues to be generated.

6. A residence and real estate located at Hancock Farm, South Road, Chilmark, Massachusetts. This residence was owned by Susan Frank Stamell until January 1993.[14] Since that time, title for this property has been held by Jared Stamell **for the benefit of Peter Frank, Jane Frank Kresch, and Susan Frank Stamell.** Based on discussions with third-party interest-holders, the government understands that this property may have a current market value in the vicinity of $3 million. The property is subject to a mortgage which in 1987 had a balance of $496,000. In the 1994 draft statement described above, Jared Stamell represented that this property had a value of $1.5 million and was subject to about $280,000 in debt. The property is also subject to a federal tax lien and a mortgage and security agreement. This agreement arises from the Franks' use of this property as security for the payment of their legal representation in the Eastern District of New York earlier this year. The government understands that outstanding legal fees secured by this property are approximately $1.9 million.

7. The tug Quenames is currently owned by Waterways Towing, Inc. In May of this year, Mr. Frank arranged the potential sale of this vessel. The vessel had an appraised value of $1.55 million. It is currently (as of May 16, 1995) subject to a mortgage or $220,000, IRS liens not exceeding $60,000, wage liens of $28,000, and lien held by Mr. Frank's attorney in the amount of $100,000. All liens deducted, its equitable value is approximately $1,142,000.

The total equity of the assets listed under this subsection is of approximately $10,-202,000.

### E. Other Sources of Income Available to Officers (the Franks) of the Corporate Defendants and Their Family Members—

1. Daniel Jacobson, a witness for defendants, testified that in 1990 Peter Frank borrowed $397,146.68 from Standard Marine Services and that said amount has never been repaid. **(Exhibit 7)**

2. In late 1991, Bunker Group Incorporated loaned over $500,000 to the officers of Virginia Tank Logistics. Peter Frank, Jane Frank Kresch, and Susan Frank Stamell each received about $90,-000 in this manner. There was only minimal activity on the loans and the documents indicate that this was simply an attempt to "make the loans look active." There is no indication that these amounts would be repaid.

3. Peter Frank, Jane Frank Kresch, and Susan Frank Stamell all maintained officer loans from various companies. At one point in 1987, Susan Frank Stamell reported a loan balance in excess of $200,000. Peter Frank's loan balance was over $400,000 in 1992.

4. Monies either paid or available to individual Frank family members during the period 1991 through 1993. According to the Franks' own records of cash receipts of Island Consulting Group (ICG), $3,058,711 was received during this time. ICG is owned entirely by Peter, Jane and Susan Frank, and has no distinct operations of its own. As such, the company files reflect nothing more than an informational tax return and all revenues and expenses are "passed through" to its owners in order that they may report on their personal tax returns. There are numerous related party expenses which coincide with the aforementioned amount, however, each of the Franks would have been allotted $1,019,-570 in cash receipts from this source alone during the period 1991–93.

5. Numerous cash disbursements (officer draws) were made from various Frank-family companies to Peter, his sisters and their mother Evelyn during this period. These amounts were significant in

---

14. For purposes of this case, although it may well be otherwise, this property is considered to have no significant equity.

1990 and 1991 (several hundred thousand), but minimal in 1992. Documents reviewed also indicate some of these account balances may not have been repaid by family members. For example, Peter Frank has had an "officer draw" balance of approximately $400,000 from one family company outstanding since 1989. Information provided by the Franks in response to government inquiries does not indicate this amount has been repaid or recognized as revenue on personal tax returns. (Related to No. 1 above.)

6. Additional information reveals that during 1990–92 cash receipts amounted to approximately $600,000 of which the sum of $153,110 was equally distributed among Peter, Susan and Jane Frank.

### F. Unpredictability With Cash Resources (See Exhibit 6)—

1. In December 1992, Peter Frank as President of Bunker Group Puerto Rico, attempted to borrow sums of $500,000 and $200,000 from various venture capital firms. Peter Frank wanted the funds wired directly to the Channel Islands and was willing to pay an effective interest rate of 50% for a six-month use of the funds. The specific need for the funds is not disclosed in the documents, however, the government's contention is that internal documents do not reflect a significant need for cash. In fact, it is asserted that quite the opposite is true for Bunker Group Puerto Rico, the borrower. A balance sheet for BGPR dated only weeks before the documented borrowing attempts show current assets and liabilities of $1,000,000 and $465,000, respectively. Of the $1 million, $773,000 were reflected as cash.

2. Peter, Jane and Susan Frank maintained "draw" accounts with various companies. Peter Frank maintained at least eight such accounts. Reports ex-

amined reflect that the Franks would take cash out of company funds and these "draws" would be recorded by bookkeepers. At the end of the year, the bookkeepers would total up the draws and record them as loans or expenses, or, in some cases, simply write them off. There is no indication of significant repayment for these draws or loans. The companies normally did not record or collect interest on the draws or loans. Additionally, it does not appear that draws or loans outstanding for extended periods of time have been recorded as income on the Franks' personal tax returns.

In sum, it is considered that the corporate defendants do have the financial resources to retain counsel. It also appears that its principal officers, namely Peter, Jane and Susan Frank, do have the same economic capacity and that they have personally benefited and continue to benefit from their corporations' activities.

The government claims that the assets listed in the Court's Order dated April 6, 1991, have a value that exceeds $19.1 million.[15] Persuaded by the evidence presented, which remains unrebutted, we agree.

### VI. CONCLUSION AND RECOMMENDATION

For all the previous stated factual and legal reasons, it is determined that Bunker Group Incorporated, Bunker Group of Puerto Rico, and New England Marines Services, being corporate defendants are not entitled to the appointment of counsel under the Criminal Justice Act (CJA) and to have legal fees and related expenses paid from public funds. Accordingly, it is **RECOMMENDED** that the initial appointment of counsel under CJA be **VACATED.** Inasmuch as no funds may be or will be disbursed under CJA provisions to pay for the legal fees and expenses already incurred in defendants' representation,[16] it is **RECOMMENDED** that an

---

**15.** It should be noted that the defendants were once more given an opportunity to assert its financial predicament, and chose not to do so.

**16.** In an attempt to further assist the Court in its determination, Attorneys Arroyo, García and Col-

lazo were requested to submit a detailed statement of attorney's work hours and expenses already incurred. (Docket No. 65). All attorneys have already submitted their statement of work hours and expenses. Among the three, it is being

Order be entered holding the corporate defendants strictly liable for the payment of such legal fees and expenses.[17]

Regarding the matter of appointment of counsel, it is **RECOMMENDED** that the corporate defendants be granted a final term of ten (10) days (that should be deemed excludable for speedy trial purposes) in order for them to retain counsel. Upon expiration of said term, unless counsel has appeared on behalf of the defendants, it is **RECOMMENDED** that counsel be appointed for the corporate defendants;[18] and that the court set hourly fees for legal services rendered and a reasonable amount for legal expenses to be incurred. It is further **RECOMMENDED** that upon considering pending proceedings and the estimated trial length, that the corporate defendants be ordered to deposit such an amount (legal fees and expenses) with the Clerk of the Court to secure fees and expenses to be reasonably incurred in their representation.

It is this Magistrate–Judge's opinion that if the above recommendation were to be accepted by this Court, that Peter Frank, as corporate representative and principal shareholder, be also made personally responsible to seek compliance with the Court's order requiring payment of legal fees incurred or face contempt penalties. It appears from the evidence presented that the corporate defendants, and Peter Frank as their representative, are once more, as other Frank corporate entities have previously done in the District of New York,[19] attempting to take all possible legal advantages from the judicial system by resorting to technicalities. As such, the corporate defendants must be compelled to realize the obvious, that all measures being taken are to assure them effective legal representation and a fair trial. Otherwise, it is also clear that no defendant will be permitted to incur in recalcitrant conduct so as to disrupt the effective administration of justice and case management.

In accordance with Rule 510.2(A), Local Rules, District of Puerto Rico, any objections to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), *reh'g denied,* 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); *Borden v. Secretary of Health and Human Services,* 836 F.2d 4, 6 (1st Cir.1987) (per curiam). The objections must be in writing and "shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the legal basis for such objections". Rule 510.2, Local Rules, District of Puerto Rico.

**IT IS SO RECOMMENDED.**

At San Juan, Puerto Rico, on this 21st day of September, 1995.

---

reported that a total of 44.5 in-court and 249 out-of-court hours have been devoted to the case and total expenses are estimated in $2,364.61. (Docket No. 66–68)

17. Inasmuch as the depositions of § 3006A are not applicable, the Court may even be called to determine the applicable legal fees per hour.

18. In its discretion, the Court may consider the appointment of Peter Frank as counsel for defendants and Jane and/or Susan Frank as corporate representatives.

19. In the District of New York the corporate defendants secured payment of legal fees by means of a lien over one of the corporation assets and now the attorneys are going through the ordeal of a civil litigation for collection of monies owed. Although the attachment of a corporate asset may be also an alternative in this case to secure payment of legal fees, this scenario, which may well create conflicting interests and deteriorate the attorney-client relationship, should be avoided.